UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal Number:   14-0049 (CKK) |
| | : | |
| | : | Violations: **FILED** |
| v. | : | |
| | : | 18 U.S.C. § 371 **MAR 1 0 2014** |
| | : | (Conspiracy) Clerk, U.S. District & Bankruptcy |
| JEFFREY E. THOMPSON, | : | Courts for the District of Columbia |
| | : | 22 D.C. Code § 1805a(a)(1) |
| Defendant. | : | (Conspiracy) |

## STATEMENT OF OFFENSE

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the United States and the defendant JEFFREY E. THOMPSON agree and stipulate that at all relevant times:

### DEFENDANT AND HIS RELATED COMPANIES

1.     Defendant JEFFREY E. THOMPSON ("THOMPSON"), a resident of the District of Columbia, was the Chairman, Chief Executive Officer, and majority owner of Thompson, Cobb, Bazilio and Associates, P.C. ("TCBA").  TCBA was a for-profit corporation registered in the District of Columbia that provided accounting, management consulting, and tax services. TCBA billed and received millions of dollars under contracts with various District of Columbia and federal government entities.  TCBA's main office was in the District of Columbia.

2.     THOMPSON was also the Chairman, Chief Executive Officer, President, and sole owner of D.C. Healthcare Systems, Inc. ("DCHSI").  DCHSI was an investment holding company and a for-profit corporation registered in the District of Columbia.  DCHSI's address in the District of Columbia was the same as TCBA's address.

3.     DCHSI   owned   D.C.   Chartered   Health   Plan,   Inc.   ("CHARTERED"). CHARTERED contracted with the District of Columbia government to provide managed care

(N)

services to a substantial number of District of Columbia residents.  CHARTERED's contract

with the District of Columbia, paid primarily by the federal government, totaled approximately

$300 million each year.  CHARTERED's main office was in the District of Columbia.

## INTRODUCTION

4.       THOMPSON was a prolific political donor.  Since 2000, THOMPSON made

contributions to nearly three dozen principal campaign committees for District of Columbia

political candidates and more than two dozen authorized committees for federal political

candidates.  As used herein, "principal campaign committees" describes the principal campaign

committees of District of Columbia candidates and "authorized committees" describes the

authorized campaign committees of federal candidates.

5.       In addition to making political contributions in his own name, THOMPSON

engaged in fundraising activities, including organizing events at TCBA's office in the District of

Columbia, to raise money for District of Columbia and federal political candidates through their

principal campaign committees and authorized committees.

6.       Contrary to District of Columbia and federal campaign finance laws,

THOMPSON solicited individuals, within the District of Columbia and across the United States,

including relatives, friends, employees, independent contractors, and the senior management of

TCBA, to make contributions and to recruit others to make contributions in their names and the

names of their relatives to principal campaign committees, authorized committees, and a federal

multicandidate political committee ("PAC 1"), induced by the assurance that THOMPSON

would arrange to pay for and otherwise reimburse the contributions.

7.       THOMPSON used personal and corporate money to advance funds and reimburse

individuals for the political contributions that they made in their names and the names of their

relatives at THOMPSON's direction.  The funding for these "conduit contributions" took several forms, including THOMPSON issuing personal checks, authorizing and directing TCBA and DCHSI to issue corporate funds, and authorizing and directing TCBA to make payments variously designated as salary and contractor payments, bonus payments, and advances on bonuses, all designed to disguise the fact that the funds were reimbursements for political contributions, whether repaid before or after the conduit contributions.

8.     THOMPSON and others at TCBA misrepresented the nature of such reimbursement payments in TCBA's accounting books and records, referring to the reimbursement payments variously as "advances," "bonuses," "advances on bonus," "AOBs," and consultant fees, among other things.  As THOMPSON and others at TCBA well knew, these terms frequently misrepresented the reimbursement payments, as the payments were not in fact advances, bonuses, advances on bonuses, or consultant fees.

9.     In addition to making conduit contributions, THOMPSON used TCBA and DCHSI to disburse excessive and unreported contributions to pay for campaign services and materials in coordination with and in support of political candidates.  The nature of these coordinated in-kind contributions, referred to herein as "shadow campaigns," took several forms, including the dissemination of campaign-prepared materials in support of political candidates. For example, during the primary election cycle for Mayor of the District of Columbia, from in or about May 2010 through in or about September 2010, THOMPSON used TCBA and DCHSI to funnel over $653,000 to pay for campaign services and campaign materials in support of a shadow campaign for a Mayoral candidate (hereafter, "MAYORAL CAMPAIGN A"). Similarly, during the primary election cycle for President of the United States, from in or about February 2008 through in or about May 2008, THOMPSON used TCBA and DCHSI to funnel

approximately $608,750 to pay for campaign services in support of a shadow campaign for a Presidential candidate (hereafter, "PRESIDENTIAL CAMPAIGN 1").

10.     In funding these shadow campaigns, THOMPSON enlisted the assistance of others, including EUGENIA HARRIS ("HARRIS"), a resident of the District of Columbia and longtime political consultant, who had been involved in District of Columbia political campaigns for over two decades.  HARRIS owned and controlled two for-profit corporations registered in, and with their offices located in, the District of Columbia: Belle International, Inc. ("BELLE"); and Details International, Inc. ("DETAILS").  BELLE and DETAILS were entities through which HARRIS, at THOMPSON's direction, paid funds to be used for shadow campaigns. Through these entities, THOMPSON funded shadow campaigns for PRESIDENTIAL CAMPAIGN 1, MAYORAL CAMPAIGN A, and other District of Columbia campaigns, including campaigns for the 2006 mayoral election, the 2007 special election for Ward 4 Member of the Council of the District of Columbia ("D.C. Council"), the 2008 election for At-Large Member of the D.C. Council, the 2010 elections for Ward 1 and Ward 6 Members of the D.C. Council, and the 2011 special election for At-Large Member of the D.C. Council.

11.     In the process of making conduit contributions and funding shadow campaigns, THOMPSON and others violated campaign finance laws and impeded District of Columbia and federal campaign finance regulators from collecting and publicly disseminating accurate campaign finance information.  By funding and concealing conduit contributions, THOMPSON and others caused the principal campaign committees and authorized committees to file reports with campaign finance regulators falsely stating that individuals had made District of Columbia and federal contributions, when, in truth and in fact, as THOMPSON well knew, the contributions were made by THOMPSON, and by TCBA and DCHSI, at THOMPSON's

direction.  These reports were materially false because they misrepresented and concealed from those regulators and the voting public the true source and amounts of contributions being made by THOMPSON, TCBA, and DCHSI.  By funding shadow campaigns through intermediaries, THOMPSON and others disguised the true source of the in-kind contributions and misrepresented and concealed from District of Columbia and federal campaign finance regulators, other candidates, and the voting public that they had funded the shadow campaigns.

12.     In the process of misrepresenting and concealing the conduit contributions and shadow campaigns, THOMPSON and others at TCBA impeded the lawful functions of the Internal Revenue Service ("IRS") by, among other things, causing and directing others to misrepresent and to conceal political contributions in TCBA's financial records and in TCBA's tax returns and filings with the IRS, creating false promissory notes to conceal the true nature of the conduit reimbursements, and making and causing false statements and documents to be submitted to the IRS in response to an IRS audit of TCBA that began in or about April 2010.

## CONSPIRACY TO VIOLATE DISTRICT OF COLUMBIA
## CAMPAIGN FINANCE LAWS

13.     The District of Columbia's Office of Campaign Finance ("OCF") was an agency and department of the District of Columbia with jurisdiction to enforce the limits and prohibitions of the District of Columbia Campaign Finance Reform and Conflict of Interest Act of 1974, as amended (then codified at D.C. Code §§ 1-1101.01 through 1-1151.06) (the "D.C. Campaign Act").  The D.C. Campaign Act regulated the role of money in the election of candidates running for District of Columbia office and provided for public disclosure of the financing of District of Columbia election campaigns by imposing limits on the amount of money that could be contributed to a District of Columbia candidate and that candidate's

principal campaign committee; prohibiting any person (including any corporation) from making a contribution in the name of another, including by reimbursement; and requiring principal campaign committees to file periodic reports of receipts and disbursements. These periodic reports, which were filed with the OCF and made publicly available, were intended to provide voters with a transparent record of such contributions to candidates for District of Columbia office.

14.     From at least in or about September 2006 through in or about April 2011, THOMPSON, together with others, unlawfully, willfully, and knowingly conspired to defraud the District of Columbia and OCF by funding and concealing contributions in excess of those permitted under the D.C. Campaign Act, and thereby obstructed and impeded the due administration of the campaign finance laws.

## Conduit Contributions

15.     THOMPSON and others conspired to defraud the District of Columbia and the OCF by causing individuals, including relatives, friends, employees, independent contractors, and the senior management of TCBA, to make contributions to the principal campaign committees of candidates for Mayor of the District of Columbia and Member of the D.C. Council; assuring such individuals that they would be reimbursed for their contributions; reimbursing those contributions using funds from THOMPSON, TCBA, and DCHSI; and misrepresenting and concealing from the OCF, other candidates, and the public that they had reimbursed individuals for contributions.

16.     To expand his capacity to fund candidates of his choice through conduit contributions, THOMPSON enlisted individuals, including INDIVIDUAL G, a trusted associate of THOMPSON, to recruit and reimburse conduits who would make contributions in their names

to THOMPSON's preferred candidates, by providing such individuals with large sums of money to use for this purpose.

17.     Between in or about September 2006 and in or about April 2011, THOMPSON utilized at least 75 conduits to make contributions to at least 15 mayoral and D.C. Council candidates in excess of at least $500,000.

### Shadow Campaigns

18.     THOMPSON and others conspired to defraud the District of Columbia and the OCF by paying for campaign services and materials in support of shadow campaigns for certain candidates for Mayor of the District of Columbia and Member of the D.C. Council and their principal campaign committees, disguising the true source of the in-kind contributions, that is, THOMPSON and his companies, by transferring the funds through intermediaries, and misrepresenting and concealing from the OCF, other candidates, and the public that they had funded the shadow campaigns.

### Secret Payments for 2010 MAYORAL CAMPAIGN A

19.     MAYORAL CAMPAIGN A was a principal campaign committee whose candidate, MAYORAL CANDIDATE A, was running for Mayor of the District of Columbia during the 2010 District of Columbia primary election cycle.

20.     VERNON HAWKINS ("HAWKINS"), a resident of the District of Columbia, was a senior advisor for MAYORAL CAMPAIGN A on matters such as staffing, communications, and field operations, which included Get Out the Vote ("GOTV") operations.

21.     D.C. COUNCIL CANDIDATE A, a resident of the District of Columbia, worked from time to time for CHARTERED and was an announced candidate for At-Large Member of the D.C. Council during the 2008 District of Columbia election cycle.

22.     Prior to March 30, 2010, THOMPSON, HAWKINS, and HARRIS discussed the potential for MAYORAL CANDIDATE A to enter the upcoming election for Mayor of the District of Columbia.  THOMPSON expressed to HAWKINS and HARRIS his willingness to financially support MAYORAL CANDIDATE A if MAYORAL CANDIDATE A decided to run for Mayor.  THOMPSON's willingness to support MAYORAL CAMPAIGN A was based on an expectation that the election of MAYORAL CANDIDATE A would improve the business climate for CHARTERED.   THOMPSON explained to HAWKINS and HARRIS that THOMPSON could not support MAYORAL CANDIDATE A in a public manner because such support would lead to retribution by the then-current Mayor and worsen the business climate for CHARTERED. THOMPSON, however, agreed to raise funds for MAYORAL CANDIDATE A from donors not publicly associated with THOMPSON.

23.     Prior to March 30, 2010, THOMPSON, HAWKINS, and MAYORAL CANDIDATE A discussed THOMPSON's willingness to raise funds for MAYORAL CANDIDATE A if MAYORAL CANDIDATE A decided to run for Mayor.  THOMPSON explained to MAYORAL CANDIDATE A that THOMPSON could not support MAYORAL CANDIDATE A in a public manner because such support would lead to retribution by the then-current Mayor and worsen the business climate for CHARTERED.

24.     On March 30, 2010, MAYORAL CANDIDATE A publicly entered the race for Mayor of the District of Columbia.

25.     After March 30, 2010, THOMPSON met with HAWKINS to discuss a shadow campaign, to be funded by THOMPSON, to pay for campaign services and campaign materials in support of MAYORAL CAMPAIGN A.  Due to the late entry of MAYORAL CANDIDATE A into the race for Mayor of the District of Columbia, HAWKINS told THOMPSON that such

contributions were neccessary for MAYORAL CANDIDATE A to win the election. THOMPSON discussed and agreed with HAWKINS and HARRIS to fund a shadow campaign in support of MAYORAL CAMPAIGN A in an amount in excess of the individual contribution limit under the D.C. Campaign Act.

26.     In order to prevent the detection of the funding of the shadow campaign by the OCF and the public, THOMPSON discussed and agreed with HAWKINS and HARRIS that funding would be provided through payments from TCBA and DCHSI to DETAILS and/or BELLE.  In May 2010, at THOMPSON's direction, DCHSI transferred approximately $15,000 to DETAILS to purchase campaign materials for the use of MAYORAL CAMPAIGN A.

27.     On or about June 7, 2010, at the request of MAYORAL CANDIDATE A, THOMPSON met with MAYORAL CANDIDATE A to discuss THOMPSON's fundraising in support of MAYORAL CANDIDATE A.  MAYORAL CANDIDATE A discussed, among other things, the report of contributions due to be filed by the candidates' principal campaign committees with OCF on June 10, 2010.   MAYORAL CANDIDATE A requested that THOMPSON expedite his fundraising to provide MAYORAL CAMPAIGN A with an opportunity to report publicly that it raised more contributions during the prior three-month period than any other candidate's principal campaign committee.   THOMPSON agreed to expedite his fundraising in support of MAYORAL CANDIDATE A, but reminded MAYORAL CANDIDATE A that his support would have to be from donors not publicly associated with THOMPSON.  It was THOMPSON's intention to reimburse many of these donors for their contributions.   To keep THOMPSON's support for MAYORAL CANDIDATE A from becoming public, THOMPSON directed MAYORAL CANDIDATE A to refer to THOMPSON

as "Uncle Earl" when discussing with others THOMPSON's support for MAYORAL CANDIDATE A.  MAYORAL CANDIDATE A agreed to keep THOMPSON's support secret.

28.     Between on or about June 7, 2010, and June 10, 2010, THOMPSON directly and indirectly caused individuals to make contributions to MAYORAL CAMPAIGN A, assured such individuals that they would be reimbursed for their contributions, and subsequently reimbursed them for those contributions using funds from THOMPSON, TCBA, and DCHSI.

29.     On or about June 10, 2010, MAYORAL CAMPAIGN A filed a report with OCF that reported more contributions in the prior three-month period than any other candidate's principal campaign committee.  The report disclosed a large number of contributions received on one day, June 10, 2010.  A significant amount of the contributions reported as received on June 10, 2010, were for contributions reimbursed directly and indirectly by THOMPSON.  As intended, the $15,000 payment made to DETAILS and used to fund the shadow campaign was not reported in the June 10, 2010 report to OCF.

30.     On or about July 28, 2010, at the direction of THOMPSON, TCBA issued a check in the amount of $87,800, payable to BELLE, to fund the shadow campaign.

31.     THOMPSON and HARRIS arranged for D.C. COUNCIL CANDIDATE A (who was not then a candidate for political office) to serve as the official campaign driver for MAYORAL CANDIDATE A and paid D.C. COUNCIL CANDIDATE A for such services. Using funds provided by THOMPSON, HARRIS leased a luxury sport utility vehicle for D.C. COUNCIL CANDIDATE A to drive when D.C. COUNCIL CANDIDATE A drove MAYORAL CANDIDATE A to campaign-related and other events.

32.     In or about August 2010, HAWKINS informed THOMPSON that, in order for MAYORAL CANDIDATE A to win the primary election, THOMPSON would have to fund

additional shadow campaign expenditures, to be used principally to pay for GOTV efforts in support of MAYORAL CAMPAIGN A. HAWKINS estimated that those additional shadow campaign expenditures would exceed $400,000. Given the size of the estimated expenditures, THOMPSON instructed HAWKINS to tell MAYORAL CANDIDATE A that if MAYORAL CANDIDATE A wanted THOMPSON to fund the additional shadow campaign expenditures, MAYORAL CANDIDATE A would have to ask THOMPSON personally. Thereafter, THOMPSON directed HARRIS to schedule a meeting between THOMPSON and MAYORAL CANDIDATE A to give MAYORAL CANDIDATE A an opportunity to ask THOMPSON personally for the additional shadow campaign expenditures.

33.    As directed by THOMPSON, HARRIS arranged a dinner meeting at her apartment between THOMPSON and MAYORAL CANDIDATE A. D.C. COUNCIL CANDIDATE A drove MAYORAL CANDIDATE A to HARRIS's apartment for the dinner meeting. During the meeting, MAYORAL CANDIDATE A discussed, among other things, the status of the mayoral race and the need for a successful GOTV campaign in order to ensure that MAYORAL CANDIDATE A won the election. MAYORAL CANDIDATE A presented to THOMPSON a one-page budget of approximately $425,000 for GOTV expenses in support of and in coordination with MAYORAL CAMPAIGN A. MAYORAL CANDIDATE A asked THOMPSON to pay for the GOTV campaign. THOMPSON agreed to pay for the GOTV campaign. Because THOMPSON's payments for the GOTV campaign could not be made public due to THOMPSON's fear of retribution from the then-current Mayor, and because they exceeded the legal limits on individual contributions, THOMPSON told MAYORAL CANDIDATE A that THOMPSON's payment for the GOTV campaign would pass through HARRIS, and that HAWKINS and HARRIS would manage the GOTV campaign in support of

and in coordination with MAYORAL CAMPAIGN A.  While leaving HARRIS's apartment, MAYORAL CANDIDATE A expressed gratitude for THOMPSON's agreement to pay for the GOTV campaign and referred to THOMPSON as "Uncle."

34.    On or about the dates below, THOMPSON authorized and directed TCBA to issue the following checks and wire payments to BELLE in order to pay for campaign services and campaign materials for the shadow campaign:

| Transaction Type | On or About Date | Amount |
|---|---|---|
| Check | September 7, 2010 | $180,000 |
| Wire Transfer | September 10, 2010 | $76,000 |
| Check | September 10, 2010 | $185,000 |
| Wire Transfer | September 14, 2010 | $125,000 |

35.    Using funds provided by THOMPSON, and in consultation with HAWKINS, HARRIS made various expenditures for the shadow campaign in support of MAYORAL CAMPAIGN A.  For example, using funds provided by THOMPSON, HARRIS paid for individuals to manage field operations and transportation related to the shadow campaign by, among other things, working directly with, sharing canvassing information with, sharing workspace with, and coordinating operations with employees and agents of MAYORAL CAMPAIGN A, including those managing the campaign's official GOTV efforts.

36.    Using funds provided by THOMPSON, and in consultation with HAWKINS, HARRIS paid for campaign materials related to the shadow campaign in support of MAYORAL CAMPAIGN A, including yard signs, t-shirts, door knockers, posters, rental vans, and catering services.

37.     On September 14, 2010, MAYORAL CANDIDATE A won the primary election for Mayor of the District of Columbia.

38.     After September 14, 2010, at the request of HAWKINS to cover a campaign expense promised by a close family member of MAYORAL CANDIDATE A, THOMPSON paid $10,000 to INDIVIDUAL G to cover the campaign expense promised by the close family member of MAYORAL CANDIDATE A on behalf of MAYORAL CAMPAIGN A. INDIVIDUAL G told THOMPSON that INDIVIDUAL G and the close family member of MAYORAL CANDIDATE A used the $10,000 to pay cash to individuals who had worked in support of MAYORAL CAMPAIGN A.

39.     On November 2, 2010, MAYORAL CANDIDATE A won the general election for Mayor of the District of Columbia.

40.     In or about November 2010, HARRIS and THOMPSON discussed a request from MAYORAL CANDIDATE A for THOMPSON to pay for expenses in support of a candidate in a local labor union run-off election.  Thereafter, THOMPSON paid approximately $10,000 to HARRIS to fund expenses of the candidate.

41.     On January 2, 2011, MAYORAL CANDIDATE A was sworn in as the Mayor of the District of Columbia.

42.     After January 2, 2011, THOMPSON funded more than $40,000 in expenditures through HARRIS to pay for home improvements, employment, and other items for the benefit of a close personal friend of MAYORAL CANDIDATE A.  MAYORAL CANDIDATE A thanked THOMPSON for getting work for the friend.

43.     In or about August 2011, THOMPSON asked HARRIS to contact MAYORAL CANDIDATE A to request MAYORAL CANDIDATE A to expedite a settlement agreement

13

between the District of Columbia government and CHARTERED.   HARRIS contacted MAYORAL CANDIDATE A to discuss expediting the matter.  Shortly thereafter, THOMPSON learned that the District of Columbia government would proceed in resolving the matter with CHARTERED.

Secret Payments for 2006 MAYORAL CAMPAIGN B

44.    MAYORAL CANDIDATE B, a resident of the District of Columbia, was an announced candidate for Mayor of the District of Columbia during the 2006 District of Columbia election cycle.   MAYORAL CAMPAIGN B was the principal campaign committee for MAYORAL CANDIDATE B.

45.    MICHAEL A. BROWN ("BROWN"), a resident of the District of Columbia, was an announced candidate for Mayor of the District of Columbia during the 2006 District of Columbia election cycle.

46.    THOMPSON supported MAYORAL CANDIDATE B through fundraising efforts of approximately $325,000, which included conduit contributions in the names of others that THOMPSON reimbursed with personal and corporate funds.

47.    In support of MAYORAL CANDIDATE B, THOMPSON funded a voter registration drive.  In July 2006, THOMPSON caused DCHSI to issue a check payable to a for-profit entity in the amount of $133,333 to fund the voter registration drive.  The primary purpose of the drive was to identify and register voters likely to vote for MAYORAL CANDIDATE B.

48.    In or around August 2006, after discussions with a senior advisor to MAYORAL CAMPAIGN B and discussions with HARRIS, THOMPSON agreed to fund a shadow campaign in support of MAYORAL CAMPAIGN B in an amount in excess of the individual contribution limit under the D.C. Campaign Act.  Between in or about August 2006 and September 2006,

14

THOMPSON caused DCHSI to issue checks payable to a for-profit entity totaling approximately $278,000, which in turn were used to pay for the shadow campaign in support of MAYORAL CAMPAIGN B, including a GOTV effort.

49.     In September 2006, when it appeared to THOMPSON that BROWN would not win the election but would take votes away from MAYORAL CANDIDATE B, THOMPSON met with BROWN to encourage BROWN to drop out of the race.  As a result of those discussions, on or about September 6, 2006, THOMPSON and BROWN agreed that THOMPSON would pay BROWN $200,000, and would enter into a consulting agreement with a lobbying firm that employed BROWN, in return for BROWN dropping out of the race for Mayor of the District of Columbia and endorsing MAYORAL CANDIDATE B.

50.     On or about September 7, 2006, BROWN publicly announced a suspension of his campaign and endorsed MAYORAL CANDIDATE B.

51.     On or about September 8, 2006, THOMPSON authorized a payment in the amount of $200,000 to be made for the intended benefit of BROWN.  THOMPSON, on behalf of TCBA, and BROWN, on behalf of a lobbying firm that employed him, also executed a 12-month consulting agreement in which TCBA agreed to pay a retainer of $12,500 per month for a total of $150,000.

<u>Secret Payments for 2007 BROWN Campaign</u>

52.     In or about April 2007, BROWN was an announced candidate in a special election for Ward 4 Member of the D.C. Council.  BROWN met with THOMPSON and sought a contribution from THOMPSON to BROWN's principal campaign committee.

53.     During the meeting, THOMPSON discussed funding BROWN's campaign and specifically discussed with BROWN: (a) that THOMPSON could not publicly support

BROWN's campaign for Ward 4 Member of the D.C. Council because of the then-Mayor's support of another candidate; but (b) that THOMPSON would have someone contact BROWN.

54.     Following this meeting, at THOMPSON's direction, HARRIS communicated with BROWN about funding the shadow campaign.  THOMPSON, through HARRIS, provided funds in support of BROWN's campaign for Ward 4 Member of the D.C. Council. THOMPSON understood that his contribution would exceed the individual contribution limit under the D.C. Campaign Act.

### Secret Payments for 2008 D.C. COUNCIL CANDIDATE A Campaign

55.     THOMPSON offered financial support to D.C. COUNCIL CANDIDATE A. During their discussions, THOMPSON and D.C. COUNCIL CANDIDATE A agreed that THOMPSON would provide financial support to D.C. COUNCIL CANDIDATE A, including through unreported and excessive in-kind contributions to be paid through HARRIS in coordination with and in support of D.C. COUNCIL CANDIDATE A's principal campaign committee.

56.     From in or about September 2008, until in or about October 2008, THOMPSON, together with HARRIS, made and disbursed in-kind contributions in excess of $100,000 in coordination with and in support of D.C. COUNCIL CANDIDATE A's principal campaign committee.

### Secret Payments for 2008 BROWN Campaign

57.     BROWN was an announced candidate for At-Large Member of the D.C. Council during the 2008 District of Columbia election cycle.  In or about October 2008, BROWN met with THOMPSON and sought approximately $100,000 from THOMPSON to fund a GOTV

shadow campaign in support of and in coordination with BROWN's principal campaign committee.

58.     During the meeting, THOMPSON agreed with BROWN to the following: (a) THOMPSON would contribute to BROWN's principal campaign committee for At-Large Member, but not in a public manner; (b) THOMPSON's contribution to BROWN's principal campaign committee would exceed the individual contribution limit under the D.C. Campaign Act; and (c) BROWN would consult with HARRIS to arrange THOMPSON's in-kind contribution.

59.     Following this meeting, at THOMPSON's direction, BROWN coordinated with HARRIS on the shadow campaign.

60.     From in or about October 2008, until in on or about November 2008, THOMPSON, together with HARRIS, and with BROWN's knowledge, using funds provided from THOMPSON, made and disbursed in-kind contributions of more than $100,000 to fund a GOTV shadow campaign in coordination with and in support of BROWN's campaign for At-Large Member of the D.C. Council.

### Secret Payments for 2010 D.C. COUNCIL CANDIDATE B Campaign

61.     D.C. COUNCIL CANDIDATE B, a resident of the District of Columbia, was employed from time to time as a consultant for CHARTERED and an announced candidate for Member of the D.C. Council, specifically, the Ward 6 seat, during the 2010 District of Columbia election cycle.

62.     D.C. COUNCIL CANDIDATE B sought THOMPSON's financial support for the election.  During their discussions, THOMPSON agreed to provide financial support to D.C. COUNCIL CANDIDATE B, including through unreported and excessive in-kind contributions

to be paid through HARRIS in coordination with and in support of D.C. COUNCIL CANDIDATE B's principal campaign committee.

63.     From at least in or about May 2010 until in or about September 2010, THOMPSON, together with HARRIS, using funds provided by THOMPSON, made and disbursed in-kind contributions of more than $26,000 in coordination with and in support of D.C COUNCIL CANDIDATE B's principal campaign committee.

### Secret Payments for 2010 D.C. COUNCIL CANDIDATE C Campaign

64.     D.C. COUNCIL CANDIDATE C, a resident of the District of Columbia, was an announced candidate for Member of the D.C. Council, specifically, the Ward 1 seat, during the 2010 District of Columbia election cycle.

65.     THOMPSON met with D.C. COUNCIL CANDIDATE C to discuss THOMPSON's interest in supporting D.C. COUNCIL CANDIDATE C.   THOMPSON and D.C. COUNCIL CANDIDATE C discussed and agreed that THOMPSON would provide financial support to D.C. COUNCIL CANDIDATE C, including through unreported and excessive in-kind contributions to be paid through others in coordination with and in support of D.C. COUNCIL CANDIDATE C's principal campaign committee.

66.     From in or about April 2010 until in or about September 2010, THOMPSON, together with others, using funds provided by THOMPSON through TCBA and DCHSI, made and disbursed in-kind contributions in excess of $140,000 in coordination with and in support of D.C. COUNCIL CANDIDATE C's principal campaign committee.

### Secret Payments for 2011 D.C. COUNCIL CANDIDATE D Campaign

67.     D.C. COUNCIL CANDIDATE D, a resident of the District of Columbia, was an announced candidate for At-Large Member of the D.C. Council during the April 2011 District of

18

Columbia special election.  CAMPAIGN D was the principal campaign committee for D.C. COUNCIL CANDIDATE D.

68.     In or around January 2011, THOMPSON discussed with HAWKINS, HARRIS, and D.C. COUNCIL CANDIDATE D the electability of D.C. COUNCIL CANDIDATE D in the upcoming special election.  THOMPSON paid for a poll to gauge, among other things, the electability of D.C. COUNCIL CANDIDATE D.   The poll reflected favorably on D.C. COUNCIL CANDIDATE D's electability.   Based on the results of the poll, THOMPSON decided to support D.C. COUNCIL CANDIDATE D in the upcoming special election.

69.     On March 10, 2011, a deadline for CAMPAIGN D to report to OCF its campaign contributions, THOMPSON met D.C. COUNCIL CANDIDATE D and others at TCBA's offices.  Earlier that day, THOMPSON purchased money orders to use for conduit contributions to pay to CAMPAIGN D.  THOMPSON put D.C. COUNCIL CANDIDATE D in an office at TCBA to solicit donors by phone, while THOMPSON solicited contributions, including conduit contributions, in support of CAMPAIGN D by phone from another office at TCBA.  D.C. COUNCIL CANDIDATE B, who was not then a candidate for political office, and a close family member of D.C. COUNCIL CANDIDATE D received the checks, money orders, credit card forms, and donation forms from THOMPSON, and together they entered the information into CAMPAIGN D's OCF report while at TCBA's offices.  At the end of the evening on March 10, 2011, CAMPAIGN D filed a report with OCF that reported more contributions in the reporting period than any other candidate's principal campaign committee.  The majority of contributions reported as received by CAMPAIGN D were for contributions reimbursed directly and indirectly by THOMPSON.

70.     At or around the same time period, THOMPSON discussed and agreed with HAWKINS to make and disburse unreported in-kind contributions, for purposes of a GOTV shadow campaign in support of D.C. Council Candidate D, in coordination with and in support of CAMPAIGN D in an amount in excess of the individual contribution limit under the D.C. Campaign Act.   Between March 4, 2011 and May 10, 2011, THOMPSON caused DCHSI to transfer approximately $148,146 to BELLE and DETAILS to fund the GOTV shadow campaign in support of CAMPAIGN D.

71.     During the campaign for the special election, THOMPSON understood that D.C. COUNCIL CANDIDATE D was aware of THOMPSON's funding of the excessive and unreported GOTV campaign.

## CONSPIRACY TO VIOLATE FEDERAL CAMPAIGN FINANCE LAWS

72.     The Federal Election Commission ("FEC") was an agency and department of the United States with jurisdiction to enforce the limits and prohibitions of the Federal Election Campaign Act of 1971, as amended, codified at 2 U.S.C. §§ 431-455 (the "Election Act"). Similar to the D.C. Campaign Act, the Election Act limited financial influence in the election of candidates running for federal office and provided for public disclosure of the financing of federal election campaigns by limiting the amount and source of money that could be contributed to a federal candidate and that candidate's authorized committee; prohibiting any person from making conduit contributions; prohibiting direct contributions of corporate money to federal candidates, their authorized committees, and PACs; and requiring authorized committees to file periodic reports of receipts and disbursements. These periodic reports, which were filed with the FEC and made publicly available, were intended to provide citizens with a transparent record of such contributions to candidates for federal office.

73.     THOMPSON, together with others, knowingly and willfully made: (a) contributions in excess of the limits of the Election Act; (b) contributions of corporate money to candidates for federal office and PAC 1; and (c) contributions to candidates for federal office in the names of other persons, each aggregating $25,000 and more in a calendar year.

### Federal Conduit Contributions

74.     THOMPSON made unlawful corporate and conduit contributions to candidates for federal office in 2006, 2007, 2008, 2009, 2010, 2011, and 2012.  During calendar year 2008, THOMPSON: (a) directly and indirectly caused individuals to make contributions to the authorized committees of candidates for the United States House of Representatives and President, as well as PAC 1, aggregating $25,000 and more in that calendar year; (b) assured such individuals that they would be reimbursed for their contributions; and (c) reimbursed those contributions using funds from THOMPSON, TCBA, and DCHSI.  During calendar year 2010, THOMPSON: (a) directly and indirectly caused individuals to make contributions to the authorized committees of candidates for the United States House of Representatives and Senate, aggregating $25,000 and more in that calendar year; (b) assured such individuals that they would be reimbursed for their contributions; and (c) reimbursed those contributions using funds from THOMPSON, TCBA, and DCHSI.

75.     Between 2006 and 2012, THOMPSON utilized at least 32 conduits to make contributions to at least 13 federal candidates and PAC 1 in excess of at least $250,000.

76.     THOMPSON and others at TCBA falsely recorded and caused to be falsely recorded certain amounts in the general ledger of TCBA and other TCBA books and records variously as "advances," "bonuses," "advances on bonus," "AOBs," and consultant fees when, in truth and in fact, those amounts represented reimbursements of corporate money for

21

contributions to candidates for federal office, which contributions were made in the names of other persons.

**Shadow Campaign in Support of PRESIDENTIAL CAMPAIGN 1**

77.     TROY WHITE ("WHITE"), a resident of the City of New York, was the operator of Wytehouse Marketing, Inc. ("WYTEHOUSE").

78.     INDIVIDUAL A, a resident of the District of Columbia, worked for a public affairs firm and served as a Senior Advisor to PRESIDENTIAL CAMPAIGN 1.

79.     INDIVIDUAL B, a resident of the State of Texas, supported PRESIDENTIAL CAMPAIGN 1 and was affiliated with CIVIC ORGANIZATION A, a civic organization that maintained tax-exempt status under Section 501(c)(4) of the Internal Revenue Code.

80.     INDIVIDUAL C, a resident of the State of Texas, was a supporter of PRESIDENTIAL CAMPAIGN 1.

81.     In or about February 2008, INDIVIDUAL A asked THOMPSON to fund street teams that would be paid to assist PRESIDENTIAL CAMPAIGN 1 during upcoming primary elections.  INDIVIDUAL A put THOMPSON in contact with WHITE, whose marketing firm organized street teams, to discuss how the use of street teams could support PRESIDENTIAL CAMPAIGN 1.

82.     Shortly after introducing THOMPSON to WHITE, INDIVIDUAL A introduced THOMPSON to INDIVIDUAL C, whom INDIVIDUAL A stated would assist WHITE with implementing paid street teams and canvassers throughout Texas.  The paid street team members and canvassers in Texas were to include members of CIVIC ORGANIZATION A, who were recruited by INDIVIDUAL B, and would provide support to PRESIDENTIAL CAMPAIGN 1.  THOMPSON, WHITE, and INDIVIDUAL A agreed that the paid street team members and

canvassers would disseminate and distribute campaign materials prepared by PRESIDENTIAL CAMPAIGN 1.   THOMPSON, WHITE, and INDIVIDUAL C communicated by phone in advance of the Texas federal primary and caucus election on March 4, 2008, including through three-way calls and the exchange of text messages.

83.    In February 2008, THOMPSON authorized TCBA to transfer $233,000 to BELLE and, in turn, HARRIS transferred $231,250 from BELLE to WYTEHOUSE to pay for the services that the street team members and canvassers would provide in support of PRESIDENTIAL CAMPAIGN 1 leading up to the Texas federal primary and caucus election on March 4, 2008:

| TCBA Wire Transfers To BELLE | BELLE Wire Transfers To WYTEHOUSE | 2008 Federal Primary Election Date |
|---|---|---|
| $134,000 on February 27, 2008 | $133,250 on February 27, 2008 | Texas Federal Primary and Caucus on March 4, 2008 |
| $99,000 on February 29, 2008 | $98,000 on February 29, 2008 | |

84.    Following the Texas federal primary and caucus election, THOMPSON agreed to continue financing WYTEHOUSE's paid street team members and canvassers in support of PRESIDENTIAL CAMPAIGN 1 in advance of the Pennsylvania federal primary election on April 22, 2008.   THOMPSON, WHITE, and INDIVIDUAL A agreed that the paid street team members and canvassers would disseminate and distribute campaign materials prepared by PRESIDENTIAL CAMPAIGN 1.   Consistent with what took place during the Texas federal primary and caucus election, INDIVIDUAL B assisted WHITE by finding individuals, many of whom were affiliated with CIVIC ORGANIZATION A, to serve as paid canvassers for PRESIDENTIAL CAMPAIGN 1 in different locations throughout Pennsylvania.

85.     In April 2008, THOMPSON authorized TCBA to transfer $156,500 to BELLE

and, in turn, HARRIS transferred $156,500 from BELLE to WYTEHOUSE to pay for the

services that the street team members and canvassers would provide in support of

PRESIDENTIAL CAMPAIGN 1 leading up to the Pennsylvania federal primary election on

April 22, 2008:

| TCBA Wire Transfers To BELLE | BELLE Wire Transfers To WYTEHOUSE | 2008 Federal Primary Election Date |
|---|---|---|
| $7,500 on April 1, 2008 | $7,500 on April 1, 2008 | Pennsylvania Federal Presidential Primary on April 22, 2008 |
| $63,000 on April 11, 2008 | $63,000 on April 11, 2008 | |
| $86,000 on April 21, 2008 | $86,000 on April 22, 2008 | |

86.     Following the Pennsylvania federal primary election, THOMPSON agreed to

continue financing WYTEHOUSE's paid street team members and canvassers in support of

PRESIDENTIAL CAMPAIGN 1 in advance of the Indiana and North Carolina federal primary

elections on May 6, 2008.  THOMPSON, WHITE, and INDIVIDUAL A agreed that the paid

street team members and canvassers would disseminate and distribute campaign materials

prepared by PRESIDENTIAL CAMPAIGN 1.  INDIVIDUAL B assisted WHITE by finding

individuals, many of whom were affiliated with CIVIC ORGANIZATION A, to serve as paid

canvassers for PRESIDENTIAL CAMPAIGN 1 in different locations throughout Indiana.

87.     On or about April 21, 2008, INDIVIDUAL A sent an e-mail to THOMPSON and

WHITE, titled "This is what they will need in NC – Please advise."  The e-mail forwarded

PRESIDENTIAL CAMPAIGN 1's strategy for maximizing visibility in North Carolina.  Later

that day, WHITE sent a reply e-mail to INDIVIDUAL A's e-mail, copying THOMPSON on the

e-mail, and wrote: "These are the cities we can cover in NC: Charlotte, Raleigh, Durham, Greensboro, Fayetteville, Wilmington, Winston-Salem. Let me know what you think ASAP."

88.     In May 2008, THOMPSON authorized DCHSI to transfer $134,000 to BELLE and, in turn, HARRIS transferred $133,000 from BELLE to WYTEHOUSE to pay for the services that the street team members and canvassers would provide in support of PRESIDENTIAL CAMPAIGN 1 leading up to the Indiana and North Carolina federal primary elections on May 6, 2008:

| DCHSI Wire Transfers To BELLE | BELLE Wire Transfers To WYTEHOUSE | 2008 Federal Primary Election Date |
|---|---|---|
| $57,000 on May 1, 2008 | $56,500 on May 2, 2008 | Indiana and North Carolina Federal Primaries on May 6, 2008 |
| $77,000 on May 6, 2008 | $76,500 on May 6, 2008 | |

89.     Following the Indiana and North Carolina federal primary elections, THOMPSON agreed to continue financing WYTEHOUSE's paid street team members and canvassers in support of PRESIDENTIAL CAMPAIGN 1 in advance of the Puerto Rico federal primary election on June 1, 2008.

90.     On or about May 22, 2008, THOMPSON authorized TCBA to transfer $88,000 to BELLE and, in turn, HARRIS transferred $88,000 from BELLE to WYTEHOUSE to pay for the services that the street team members and canvassers would provide in support of PRESIDENTIAL CAMPAIGN 1 leading up to the Puerto Rico federal primary election on June 1, 2008:

| TCBA Wire Transfer To BELLE | BELLE Wire Transfer To WYTEHOUSE |
|---|---|
| $88,000 on May 22, 2008 | $88,000 on May 23, 2008 |

91.     On or about May 29, 2008, INDIVIDUAL B sent an e-mail to THOMPSON titled "Fwd: Pics" and wrote: "We bought everything or made it here [in] PR.  All the white shirts [waving] signs or flags are our people.  This is just one of the many sights across the island being covered since last Friday.  The caravan of vans together with the 18 wheeler sound system is unbelievable . . . . See you soon."

92.     During the 2008 presidential primary election cycle, THOMPSON authorized approximately $611,500 to be transferred from TCBA and DCHSI to BELLE, of which $608,750 was funneled to WYTEHOUSE to pay for services WYTEHOUSE and others provided in support of PRESIDENTIAL CAMPAIGN 1.  These services included assembling and organizing paid street teams and canvassers to disseminate and distribute campaign materials prepared by the PRESIDENTIAL CAMPAIGN 1, including posters, lawn signs, pamphlets, and stickers.  The agreed-upon goal of these efforts was to raise PRESIDENTIAL CAMPAIGN 1's visibility during the 2008 presidential primary election cycle.

93.     As intended by THOMPSON, the hundreds of thousands of dollars in corporate funds THOMPSON funneled through BELLE and to WYTEHOUSE to provide services in support of PRESIDENTIAL CAMPAIGN 1 during the 2008 election cycle were never reported to the FEC because THOMPSON knew that funding this effort violated federal campaign finance laws.

94.     THOMPSON directed and caused the wire transfers from TCBA and DCHSI to BELLE to be recorded in the books and records of TCBA and DCHSI as advances to THOMPSON and consulting fees, respectively, in order to conceal the true nature of the illegal corporate and excessive campaign contributions to PRESIDENTIAL CAMPAIGN 1.

95.     During these time periods, a major political party in Texas employed what is known as a "two-step" voting process in which voters were allowed to vote twice, once in a primary and once in a caucus.  Approximately two-thirds of the delegates would go to the winner of the primary and approximately one-third of the delegates would go to the winner of the caucus.

96.     On or about April 11, 2008, THOMPSON received an e-mail from INDIVIDUAL B in which INDIVIDUAL B wrote: "Mr. [THOMPSON], Troy White suggested I contact you in regards to a challenge to the Texas Democratic Party caucus system.  Like you I am a strong supporter of [PRESIDENTIAL CAMPAIGN 1] and have done my best to help [it] win.  Along with the help we were able to do through you, I have organized over 400 volunteers for [PRESIDENTIAL CAMPAIGN 1] during super Tuesday in AZ and NM.  [PRESIDENTIAL CAMPAIGN 1] won both of those states.  In Texas I helped organize the volunteer effort for south Texas and have been in charge of senatorial district 19 for the caucus.  [PRESIDENTIAL CAMPAIGN 1] carried senatorial 19 caucus 70/30.  I now believe we have a decent shot of knocking out the whole caucus system depriving [CAMPAIGN 2] of those delegates which [they] won state wide.  [CIVIC ORGANIZATION A] believes we have a good possibility of throwing out the Caucus system in Texas by challenging the caucus system as having a discriminatory impact against the Latino (predominately Mexican-American) community in Texas. . . .  Thank you for allowing us to help [PRESIDENTIAL CAMPAIGN 1]."

97.    On or about April 14, 2008, INDIVIDUAL B, on behalf of CIVIC ORGANIZATION A, attended a meeting at TCBA that included THOMPSON and others. During this meeting, THOMPSON agreed to finance a demonstration in the District of Columbia that would be organized by CIVIC ORGANIZATION A.  The demonstration was to take place in front of a major political party's headquarters regarding the decision not to seat delegates from a state whose primary election had already occurred.  THOMPSON agreed to pay for the meals, lodging, promotion, and transportation of the demonstrators who were CIVIC ORGANIZATION A members.

98.    On or about April 24, 2008, THOMPSON authorized DCHSI to transfer approximately $150,000 to CIVIC ORGANIZATION A's bank account to pay for the demonstration in the District of Columbia organized by CIVIC ORGANIZATION A.

99.    In or about April 2008, THOMPSON also agreed to finance a lawsuit that would be filed by CIVIC ORGANIZATION A in federal court in Texas to challenge the Texas "two-step" voting process.

100.    On or about April 30, 2008, THOMPSON authorized DCHSI to transfer approximately $50,000 from its corporate bank account in the District of Columbia to CIVIC ORGANIZATION A's bank account to pay for the lawsuit in Texas challenging the "two-step" voting process.

101.    On or about May 1, 2008, INDIVIDUAL B sent an e-mail to THOMPSON and INDIVIDUAL A titled "Media Coverage Florida Voters" and wrote: "There was a great event today organized by [CIVIC ORGANIZATION A] . . . .  Hundreds came to DC and demonstrated in front of the [political party]."

102.    On or about May 14, 2008, INDIVIDUAL B sent an e-mail to THOMPSON and INDIVIDUAL A titled "[CIVIC ORGANIZATION A] TRO Motion" and provided an update on the status of the lawsuit filed in federal court in Texas challenging the "two-step" voting process. INDIVIDUAL B directed THOMPSON and INDIVIDUAL A to contact INDIVIDUAL B with any questions.

103.    THOMPSON directed and caused the wire transfers to CIVIC ORGANIZATION A to be recorded in DCHSI's books and records as a charitable contribution when, in truth and in fact, the funds were provided to assist PRESIDENTIAL CAMPAIGN 1.

### CONSPIRACY TO VIOLATE THE INTERNAL REVENUE LAWS

104.    EMPLOYEE A was a resident of the Commonwealth of Virginia, a certified public accountant, and the controller for TCBA, working under THOMPSON's direction. THOMPSON and EMPLOYEE A caused TCBA to disguise and record falsely TCBA's conduit contribution reimbursement payments to TCBA's partners, principals, employees, and consultants as "advances," "bonuses," "advances on bonus," "AOBs," and consultant fees in TCBA's books and records.   THOMPSON and EMPLOYEE A knew that TCBA's conduit contribution reimbursement payments were not accurately described in TCBA's books and records.

105.    In or about April 2007, THOMPSON and EMPLOYEE A caused TCBA to misrepresent, conceal, and improperly deduct TCBA's conduit contribution reimbursement payments to LEE CALHOUN ("CALHOUN"), a TCBA principal and conduit contributor, in TCBA's Form 1120 U.S. Corporate Income Tax Return for 2007.   THOMPSON directed EMPLOYEE A to zero-out an "advance" account that EMPLOYEE A had created in TCBA's books and records in CALHOUN's name.   To do so, EMPLOYEE A falsely designated as a

"bonus" approximately $78,000 in past conduit contribution reimbursement payments to CALHOUN by TCBA. EMPLOYEE A grossed-up the purported "bonus" to allow TCBA to withhold approximately $47,000 in taxes that CALHOUN would have owed on his personal income tax return, which allowed CALHOUN to avoid incurring any tax liability as a result of his participation as a conduit contributor. THOMPSON and EMPLOYEE A caused TCBA to issue a false W-2 tax form to CALHOUN for 2007, which overstated CALHOUN's actual income from TCBA. THOMPSON and EMPLOYEE A knew that TCBA's conduit contribution reimbursement payments to CALHOUN were not tax-deductible by TCBA.

106. THOMPSON and EMPLOYEE A caused TCBA to file false corporate income tax returns that misrepresented, concealed, and improperly deducted TCBA's conduit contribution reimbursement payments to certain TCBA employees in TCBA's Form 1120 U.S. Corporate Income Tax Returns for 2007 and 2008. THOMPSON and EMPLOYEE A caused TCBA to prepare and send false W-2 tax forms to certain employees that included conduit contribution reimbursement payments as income to those employees. THOMPSON and EMPLOYEE A knew that TCBA's conduit contribution reimbursement payments to TCBA's employees were not tax-deductible by TCBA.

107. THOMPSON and EMPLOYEE A caused TCBA to file false corporate income tax returns that misrepresented, concealed, and improperly deducted TCBA's conduit contribution reimbursement payments to consultants in TCBA's Form 1120 U.S. Corporate Income Tax Returns for 2006, 2007, 2008, 2009, 2010, and 2011. For example, THOMPSON and EMPLOYEE A caused TCBA to misrepresent, conceal, and improperly deduct TCBA's conduit contribution reimbursement payments to STANLEY STRAUGHTER, a consultant for TCBA and a conduit contributor, in TCBA's Form 1120 U.S. Corporate Income Tax Returns for

2008, 2009, and 2010. THOMPSON and EMPLOYEE A knew that TCBA's conduit contribution reimbursement payments to consultants were not tax-deductible by TCBA.

108. THOMPSON caused DCHSI to file a false Form 1120 U.S. Corporate Income Tax Return that misrepresented, concealed, and improperly deducted DCHSI's payments of a total of $134,000 to WYTEHOUSE, which were made in support of PRESIDENTIAL CAMPAIGN 1, as consulting fees and tax-deductible business expenses. THOMPSON knew that DCHSI's payments to WYTEHOUSE were not tax-deductible by DCHSI.

109. THOMPSON caused DCHSI to file a false Form 1120 U.S. Corporate Income Tax Return that misrepresented, concealed, and improperly deducted DCHSI's payments of a total of $200,000 to CIVIC ORGANIZATION A, which were made in support of PRESIDENTIAL CAMPAIGN 1, as tax-deductible charitable contributions. THOMPSON knew that DCHSI's payments to CIVIC ORGANIZATION A were not tax-deductible by DCHSI.

110. In or about April 2010, the IRS notified TCBA and THOMPSON of an audit. Prior to responding and participating in the IRS audit, THOMPSON informed EMPLOYEE A about the impending audit. From in or about July 2010, through March 2, 2012, THOMPSON and EMPLOYEE A, at THOMPSON's direction, caused TCBA to provide false and misleading statements and documents from TCBA's general ledger and its books and records to the IRS auditor in a continuing effort to misrepresent and conceal TCBA's unlawful conduit and in-kind contributions.

111. THOMPSON discussed the IRS audit with two TCBA officers (hereafter, "OFFICER A" and "OFFICER B"). In response to specific requests from the IRS auditor concerning TCBA's shareholder loans and advance accounts, THOMPSON caused a TCBA

employee to create false, backdated documents, including false promissory notes. THOMPSON met with OFFICER A and OFFICER B to discuss the need to sign the false promissory notes and to provide the false promissory notes to the IRS auditor. This was done to conceal TCBA's conduit contributions from the IRS. As part of that meeting, THOMPSON, OFFICER A, and OFFICER B executed the false promissory notes. As agreed, THOMPSON caused the false promissory notes to be given to the IRS auditor.

112.   In or about December 2011, THOMPSON and HARRIS agreed that she would file a Form 1120X Amended U.S. Corporation Income Tax Return for BELLE in an effort to conceal TCBA's funding of the shadow campaign for MAYORAL CAMPAIGN A. THOMPSON caused TCBA to create additional false documents, and provided the false documents to HARRIS, in an effort to conceal TCBA's funding of the shadow campaign for MAYORAL CAMPAIGN A.

This statement of the offense is not intended to constitute a complete recitation of all facts known by THOMPSON, but is, instead, intended to provide the necessary legal basis for the guilty plea.

RONALD C. MACHEN JR.
United States Attorney
D.C. Bar No. 447889

By: _____

Michael K. Atkinson, D.C. Bar No. 430517
Loyaan A. Egal, New York Bar
Lionel Andre, D.C. Bar No. 422534
Ellen Chubin Epstein, D.C. Bar No. 442861
Jonathan P. Hooks, D.C. Bar No. 468570
Ephraim (Fry) Wernick, D.C. Bar No. 497158
Assistant United States Attorneys
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C.  20530

**Defendant's Acceptance**

I have read this Statement of the Offense and carefully reviewed every part of it with my attorneys. I am fully satisfied with the legal services provided by my attorneys in connection with this Statement of the Offense and all matters relating to it. I fully understand this Statement of the Offense and voluntarily agree to it. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully. No agreements, promises, understandings, or representations have been made with, to, or for me other than those set forth in the plea agreement.

3/7/14

Date

JEFFREY E. THOMPSON

**Defense Counsel's Acknowledgment**

We are Jeffrey E. Thompson's attorneys. We have reviewed every part of this Statement of the Offense with him. It accurately and completely sets forth the Statement of the Offense agreed to by the defendant and the Office of the United States Attorney for the District of Columbia.

3/7/14

Date

TOBIN J. ROMERO

33