## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Criminal No. 1:14-cr-049 (CKK)** |
| **v.** | : | |
| | : | |
| **JEFFREY E. THOMPSON,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America by and through its attorney, the United States Attorney for the District of Columbia, submits this memorandum in aid of sentencing.  On March 10, 2014, defendant Jeffrey Thompson (the "defendant") pleaded guilty to a two count Information charging him with one count of Conspiracy, in violation of 18 U.S.C. § 371, 2 U.S.C. §§ 437g(d)(1)(A)(i), 441a(a)(1)(A), 441b(a), and 441f, and 26 U.S.C. § 7206(2) (Count One), and one count of Conspiracy, in violation of 22 D.C. Code § 1805a(a)(1) (Count Two).   Under the terms of the Plea Agreement, pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the defendant faced a sentence of up to 18 months of incarceration (and three years of supervised release) on Count One (the federal conspiracy charge) and a sentence of up to six months of incarceration (and three years of supervised release) on Count Two (the D.C. Code conspiracy charge).   Under the Plea Agreement, if the defendant complies with his plea agreement, including the cooperation provisions, the Court will dismiss Count One at sentencing.   *See* Plea Agreement, Case No. 14-cr-49 (Dkt. No. 7, filed 03/10/2014).   The Court accepted the terms of the Plea Agreement on May 15, 2014.   The defendant has complied with the Plea Agreement.   As a result, Count One will be dismissed at sentencing, leaving the defendant subject only to the penalties

applicable to the D.C. Code offense in Count Two.   For the reasons discussed below, the Government recommends a sentence of six months home confinement, followed by three years of supervised release, and the maximum fine of $10,000.

## FACTS

The defendant was a prolific political donor.   Since 2000, the defendant made campaign contributions to nearly three dozen principal campaign committees for District of Columbia political candidates and more than two dozen authorized committees for federal political candidates.   *See* Statement of Offense, ECF No. 6 (filed March 10, 2014) (hereinafter, "Thompson SOO") at ¶ 4.[1]   In addition to making campaign contributions in his own name, the defendant engaged in fundraising activities to raise money, often illegally, for District of Columbia and federal political candidates.

Although the defendant's motives for the campaign contributions and fundraising activities were sometimes mixed, he often intended them to assist his two companies:   Thompson, Cobb, Bazilio and Associates, P.C. ("TCBA"), a for-profit corporation that provided accounting, management consulting, and tax services, where the defendant was the Chairman, Chief Executive Officer, and majority owner; and D.C. Healthcare Systems, Inc. ("DCHSI"), an investment holding company and owner of D.C. Chartered Health Plan, Inc. ("Chartered"), where the defendant was the Chairman, Chief Executive Officer, President, and sole owner.   TCBA billed and received millions of dollars under contracts with various District of Columbia and federal government entities.   Chartered, which contracted with the District of Columbia government to

---

[1] As used herein, "principal campaign committees" describes the principal campaign committees of District of Columbia candidates and "authorized committees" describes the authorized campaign committees of federal candidates.

provide managed care services to a substantial number of District of Columbia residents, had a contract with the District of Columbia, paid primarily by the federal government, which totaled approximately $300 million each year. Thompson SOO ¶¶ 1-3.

### Conduit Contributions

The defendant's campaign contributions and fundraising activities were often illegal, as he well knew. From at least September 2006 through April 2011, contrary to District of Columbia and federal campaign finance laws, the defendant solicited individuals, within the District of Columbia and across the United States, including relatives, friends, employees, independent contractors, and the senior management of TCBA, to make contributions and to recruit others to make contributions in their names and the names of their relatives to principal campaign committees, authorized committees, and a federal multicandidate political committee ("PAC 1"), induced by the assurance that the defendant would arrange to pay for and otherwise reimburse the contributions. Thompson SOO ¶¶ 6, 14. The defendant used personal and corporate money to advance funds and reimburse individuals for the political contributions that they made in their names and the names of their relatives at the defendant's direction. The funding for these "conduit contributions" took several forms, including the defendant issuing personal checks, authorizing and directing TCBA and DCHSI to issue corporate funds, and authorizing and directing TCBA to make payments variously designated as salary and contractor payments, bonus payments, and advances on bonuses, all designed to disguise the fact that the funds were reimbursements for political contributions, whether repaid before or after the conduit contributions. Thompson SOO ¶ 7. Between September 2006 and April 2011, the defendant used at least 75 conduits to make contributions to at least 15 mayoral and D.C. Council candidates

in excess of at least $500,000.   Thompson SOO ¶ 17.   On the federal side, between 2006 and

2012, the defendant used at least 32 conduits to make contributions to at least 13 federal candidates

and PAC 1 in excess of at least $250,000.   Thompson SOO ¶ 75.[2]

**Shadow Campaigns/Excessive Unreported Contributions**

In addition to making illegal conduit contributions, the defendant used TCBA and DCHSI

to disburse excessive and unreported contributions to pay for campaign services and materials in

coordination with and in support of political candidates.   The nature of these coordinated in-kind

contributions, referred to herein as "shadow campaigns," took several forms, including paying

canvassers to perform various get-out-the-vote ("GOTV") activities, such as the dissemination of

campaign-prepared materials in support of political candidates, and paying for such campaign

materials or other services (e.g., advertising, t-shirt, rental vans for canvassers, predictor-dialer

services to assist making GOTV calls).   The defendant financed shadow campaigns for the

following local District of Columbia elections:

- ■ During the 2010 primary election cycle for Mayor of the District of Columbia, from
  May 2010 through September 2010, the defendant used TCBA and DCHSI to funnel
  over $653,000 to pay for campaign services and campaign materials in support of a
  shadow campaign for a Mayoral candidate (hereafter, "Mayoral Campaign A").
  Thompson SOO ¶¶ 19-43.[3]

---

[2] Two former TCBA employees, Lee Calhoun and Stanley Straughter, have pleaded guilty to participating in such conduit contributions and both were sentenced by this Court to probation. *See United States v. Lee Calhoun*, 13-cr-173 (CKK) and *United States v. Stanley Straughter*, 13-cr-181 (CKK).

[3] Five other individuals have pleaded guilty to participating in illegal activities associated with Mayoral Campaign A.   *See United States v. Howard Brooks*, 12-cr-130 (CKK); *United States v. Thomas Gore*, 12-cr-29 (CKK); *United States v. Vernon Hawkins*, 13-cr-227 (CKK); *United States v. Eugenia Clark Harris*, 12-cr-156 (CKK); and *United States v. Mark Long*, 2014-CF2-15615 (D.C. Superior Court).   Brooks was sentenced to probation.   Gore and Hawkins were each sentenced to six months of incarceration.   Harris is pending sentencing.   Long, referred to as "D.C. Council Candidate A," *see* Thompson SOO ¶ 31, was sentenced to probation.

- During the 2006 election cycle for Mayor of the District of Columbia, the defendant supported Mayoral Campaign B and Mayoral Candidate B through fundraising efforts of approximately $325,000, which included conduit contributions, a voter registration drive that cost $133,333, a shadow campaign totaling approximately $278,000, and a promise to pay $200,000 to a challenger, Michael A. Brown, in return for Brown dropping out of the race and endorsing Mayoral Candidate B.   Thompson SOO ¶¶ 44-51.

- During the 2007 special election for the Ward 4 Member of the D.C. Council, the defendant financed a shadow campaign for Brown's unsuccessful campaign. Thompson SOO ¶¶ 52-54.

- During the 2008 election for At-Large Member of the D.C. Council, the defendant paid in excess of $100,000 for Brown's successful campaign. Thompson SOO ¶¶ 57-60.[4]

- During the same 2008 election, the defendant paid in excess of $100,000, through unreported and excessive in-kind contributions, for Mark Long's unsuccessful campaign for a seat on the D.C. Council.   Thompson SOO ¶¶ 55-56.

- During the 2010 election for the Ward 6 Member of the D.C. Council, the defendant paid more than $26,000, through unreported and excessive in-kind contributions, for the unsuccessful campaign of Kelvin Robinson, referred to as "D.C. Council Candidate B."   Thompson SOO ¶¶ 61-63.[5]

- During the 2010 D.C. Council election for the Ward 1 Member of the D.C. Council, the defendant made and disbursed over $140,000 for the unsuccessful campaign of Jeff Smith, referred to as "D.C. Council Candidate C."   Thompson SOO ¶¶ 64-66.[6]

---

[4] As part of his unrelated conviction for bribery, former D.C. Councilmember Brown admitted accepting illegal campaign contributions from Thompson during Brown's successful 2008 election for At-Large Member of the D.C. Council, his unsuccessful campaign for the 2007 special election for Ward 4 Member of the D.C. Council, and his unsuccessful mayoral campaign in 2006. *See United States v. Michael A. Brown*, 13-cr-164 (BAH).   Brown was sentenced to 39 months of incarceration.

[5] Kelvin Robinson pleaded guilty to accepting illegal campaign contributions from Thompson during his unsuccessful 2010 campaign.   *See United States v. Kelvin Robinson*, Case No. 2014-CF2-8873 (D.C. Superior Court).   Robinson was sentenced to probation.

[6] Jeff Smith pleaded guilty to accepting illegal campaign contributions from Thompson during his unsuccessful 2010 campaign.   *See United States v. Jeff Smith*, Case No. 2014-CF2-10925 (D.C. Superior Court).   Smith was sentenced to 60 days of incarceration.

- ■ During the 2011 special election for At-Large Member of the D.C. Council, the defendant made conduit contributions and paid approximately $148,146 for a shadow campaign to support D.C. Council Candidate D.   Thompson SOO ¶¶ 67-71.

In addition to local elections, during the primary election cycle for President of the United States, from in or about February 2008 through in or about May 2008, the defendant used TCBA and DCHSI to funnel approximately $608,750 to pay for campaign services in support of a shadow campaign for a Presidential candidate (hereafter, "Presidential Campaign 1").   Thompson SOO ¶¶ 9-10, 77-103.[7]

In the process of making conduit contributions and funding shadow campaigns, the defendant and others violated campaign finance laws and impeded District of Columbia and federal campaign finance regulators from collecting and publicly disseminating accurate campaign finance information.   By funding and concealing conduit contributions, the defendant and others caused the principal campaign committees and authorized committees to file reports with campaign finance regulators falsely stating that individuals had made District of Columbia and federal contributions, when, in truth and in fact, as the defendant well knew, the contributions were made by him, and by TCBA and DCHSI at his direction.   These reports were materially false because they misrepresented and concealed from those regulators and the voting public the true source and amounts of contributions being made by the defendant, TCBA, and DCHSI.   By funding shadow campaigns through intermediaries, the defendant and others disguised the true source of the in-kind contributions and misrepresented and concealed from District of Columbia

---

[7] One individual pleaded guilty to participating in illegal activity associated with Presidential Campaign 1.   *See United States v. Troy White*, 13-cr-256 (CKK).   White was sentenced to probation.

and federal campaign finance regulators, other candidates, and the voting public that they had funded the shadow campaigns.   Thompson SOO ¶ 11.

**False Statements to the IRS**

In the process of misrepresenting and concealing the conduit contributions and shadow campaigns, the defendant and others at TCBA impeded the lawful functions of the Internal Revenue Service ("IRS") by, among other things, causing and directing others to misrepresent and conceal political contributions in TCBA's financial records and in TCBA's tax returns and filings with the IRS, creating false promissory notes to conceal the true nature of the conduit reimbursements, and making and causing false statements and documents to be submitted to the IRS in response to an IRS audit of TCBA that began in or about April 2010.   Thompson SOO ¶¶ 12, 104-112.

**Obstruction of the Federal Investigation**

In addition, after the federal investigation into campaign finance irregularities began in 2011, and in particular after news coverage in mid-2011 highlighted Thompson's prolific fundraising, *see* "The King of Campaign Cash," Washington City Paper (June 29, 2011),  the defendant engaged in extensive efforts that appeared to be intended to obstruct the investigation and involved numerous individuals in his efforts to do so.   Among other things, the investigation revealed that:

- In late 2011 and early 2012, the defendant discussed with various individuals sending witnesses involved in the shadow campaign related to the 2010 mayoral primary out of the country, including the GOTV director (who travelled to Brazil for an extended period) and the transportation coordinator (who was paid to extend travel outside the area for additional periods).   Such travel was ultimately funded by the defendant, often through Harris.   The defendant and Harris even sent a "minder" to ensure that the shadow campaign GOTV director remained in Brazil.

7

- In late 2011, the defendant had others shred various files at TCBA documenting his campaign finance offenses.

- In or about December 2011, the defendant had a TCBA employee delete digital files from TCBA copiers likely to contain records of his campaign finance offenses.   The defendant further asked the employee to delete digital files from a hard drive related to such offenses.   Although such files were originally removed, they were ultimately recovered.

- The defendant also asked his personal assistant (who had information related to various of the defendant's other campaign finance offenses) to travel away from the area, although the assistant ultimately refused to do so.

- In December 2011 and January 2012, the defendant devised and executed a scheme with Harris to further obstruct the investigation, which involved (a) creating documentation falsely purporting to reflect that the 2010 mayoral shadow campaign payments to Harris were payments for legitimate consulting services; (b) conspiring with Harris to create and submit false amended tax returns reflecting the same for Harris's company; (c) paying Harris additional amounts to cover the taxes due under such scheme; (d) conspiring with Harris to submit invoices to the official campaign falsely purporting to document that Harris was the progenitor of the shadow campaign; and (e) making arrangements for Harris to travel to Brazil after such invoices were submitted to the campaign in or about early 2012.   Put differently, the defendant schemed with Harris to have Harris purport to take full responsibility for the shadow campaign while arranging for her to flee the country so that she – and the others, such as the defendant, who were also responsible for the shadow campaign – would escape liability.

## DISTRICT OF COLUMBIA GUIDELINES CALCULATION

Since June 14, 2004, voluntary guidelines have been in effect for all pleas and verdicts in the Superior Court of the District of Columbia.   The guidelines apply for felony offenses only. The D.C. Guidelines rank all felony offenses in the D.C. Code in groups by level of severity.   The offense severity is based on the offense of conviction.   The charge of Conspiracy, in violation of 22 D.C. Code § 1805a(a)(1), is classified as a Group Nine offense under the D.C. Guidelines.   The guideline range for a Group Nine offense and a Criminal History Score "A" is 1 to 12 months. *See* Presentence Report ("PSR") ¶¶ 150, 203.

8

## U.S. SENTENCING GUIDELINES CALCULATION

Although the U.S. Sentencing Guidelines are not directly applicable to the remaining D.C. Code charge upon which the defendant is to be sentenced, they are relevant for the Court to consider as reflecting the severity of the defendant's other offense conduct related to Count One, the defendant's federal conduit contributions and shadow campaigns conspiracy.   As previously noted, the offense level and guidelines range for Count One would be as follows:

The defendant is charged in Count One, pursuant to Title 18, United States Code, Section 371, with one count of conspiring to violate Title 2, United States Code, Sections 441a, 441b, 441f, and Title 26, United States Code, Section 7206(2).   The government estimates that the following Sentencing Guidelines apply to Count One where the objects of the conspiracy were to violate the campaign finance laws and to submit a false return to the Internal Revenue Service:

### Campaign Finance Laws

| | | |
|---|---|---|
| U.S.S.G. § 2C1.8(a)      Base Offense Level | | 8 |
| U.S.S.G. § 2C1.8(b)(1) Value of Transactions (More than $1,000,000) | | 14 |
| U.S.S.G. § 2C1.8(b)(4) More than 30 Transactions | | 2 |
| U.S.S.G. § 3B1.3         Organizer/Leader | | 4 |
| U.S.S.G. § 3C1.1         Obstruction | | 2 |
| | Total | 30 |

### Internal Revenue Laws

| | | |
|---|---|---|
| U.S.S.G. §§ 2T1.9(a)(1) and 2T4.1(F) Base Offense Level | | 16 |
| U.S.S.G. § 3B1.3                Organizer/Leader | | 4 |
| U.S.S.G. § 3C1.1                Obstruction | | 2 |
| | Total | 22 |

Because the offense level applicable to the campaign finance laws is higher than the offense level applicable to the internal revenue laws, the total offense level applicable to Count One of the Information is 30.

### Acceptance of Responsibility

Because three levels of adjustment for acceptance of responsibility would be warranted, the applicable Guidelines Offense Level would be 27.

9

**Estimated Applicable Sentencing Guidelines Range**

Based upon the total offense level and an estimated Criminal History Category I, the defendant's estimated Sentencing Guidelines range for Count One is 70 months to 87 months, which exceeds both the statutory maximum sentence of 60 months and the parties' agreed sentencing limitation that any sentence of incarceration will not exceed 18 months for Count One.  Further, pursuant to U.S.S.G. § 5E1.2, should the Court impose a fine for Count One at Guidelines level 27, the estimated applicable fine range is $12,500 to $125,000.

*See* Government letter of March 8, 2014, ECF No. 7 at pages 13-14.

## GOVERNMENT'S POSITION ON SENTENCING

As set forth above, the United States recommends a sentence of 6 months home confinement, followed by three years of Supervised Release, and a fine of $10,000.  Such a sentence is appropriate in light of all the factors to be considered at sentencing under 18 U.S.C. § 3553(a).

### A.  The Nature and Circumstances of the Offense

The nature and circumstances of the offense are set forth above.

### B.  The History and Characteristics of the Defendant

The defendant's history and character reflect his success at attaining his objectives, despite a lack of a firm moral code.  After coming to the United States as a young adult, he had an ingrown ambition to be somebody financially and socially.   But fortune hunting became a disease for him.   And a frequent result as he grew older was that he attained his objectives dishonestly.

The son of a farmer and domestic worker, and the youngest of eleven children, the defendant came to the United States from Jamaica in 1975, at the age of 20.   He obtained his GED and attended the University of the District of Columbia, working at the same time as a bookkeeper for a trade association.  *See* PSR ¶ 184.   By 1980, he had earned a Bachelor's degree in Business

Administration from the University of the District of Columbia.  He used his degree to obtain employment as a senior accountant and, later, as the manager of a finance department.

But the defendant had greater financial ambitions, and within a few years he realized extraordinary financial success.  Beginning in 1983, he founded and became the managing partner of his own company, TCBA, an accounting firm that he led until his departure in March 2012.  At the time of his departure, TCBA reportedly was the largest black-owned business of its kind in the United States, had a staff of roughly 200 employees, and had an additional 300 people who were contractors.  Along with its stable of Fortune 500 clients, TCBA billed and received millions of dollars under contracts with various District of Columbia and federal government entities.

In addition to his work at TCBA, in the spring of 2000, the defendant became the sole owner, Chairman, and CEO of DCHSI, an investment holding company and owner of Chartered, which the defendant reportedly purchased for approximately $4 million.  Chartered contracted with the District of Columbia government to provide managed care services to a substantial number of District of Columbia residents.  In the ensuing years, the defendant expanded Chartered's business exponentially.  By 2012, its contract with the District of Columbia, paid primarily by the federal government, totaled approximately $300 million each year, making Chartered (and, by extension, the defendant) the District's largest government contractor.

The defendant's expanded business interests went warp and woof with his increased donations to political campaigns and cultivation of close relationships with local and national figures.  As discussed above, from 2000 to 2012, the defendant contributed over $2.5 million in conduit contributions and illegal shadow campaigns to D.C. and federal candidates.  He also

contributed his time, money, and name to numerous civic organizations.   *See* PSR ¶ 186. Although never elected to public office, he reportedly began to refer to himself as "the Governor" of the District of Columbia.   *See* "'The Governor' of D.C.," The Washington Post (July 14, 2013). The defendant had attained his objectives.   He had made himself somebody financially and socially, albeit dishonestly.

And, then, his worlds collided.   In March 2012, search warrants related to the instant investigation were executed at, among other places, TCBA's office and the defendant's residence. In the ensuing months, as the investigation proceeded and the extent of the defendant's dishonesty was put under a spotlight, the defendant lost his financial empire and social status.   Shortly after execution of the search warrants, the defendant stepped down from his positions at TCBA, and a couple months later, in July 2012, he sold his interest in TCBA.   *See* PSR ¶¶ 179-180.   In October 2012, D.C. Chartered went into a receivership.   In 2013, DCHSI and D.C. Chartered defaulted on a $12 million loan, which the defendant had guaranteed, and the lender subsequently sued the defendant.   *See* PSR ¶ 177.   In March 2014, the defendant pleaded guilty to the instant charges, admitting that his financial life had been helped, in part, through a shadow network of crooked campaign contributions and expenditures.   The combination of the criminal investigation, his guilty plea, and the ensuing publicity was a searing experience for the defendant: He is no longer the same somebody, financially or socially, as he was before.

**C. The Need for the Sentence Imposed (A) To Reflect the Seriousness of the Offense, To Promote Respect for the Law, and To Provide Just Punishment for the Offense; (B) To Afford Adequate Deterrence; and (C) To Protect the Public from Further Crimes of the Defendant.**

Ordinarily, to adequately reflect the extremely serious nature of the defendant's offense, promote respect for the law, and justly punish such behavior, an appropriate sentence would

include a period of incarceration.   Put simply, for over a decade, the defendant organized and directed the largest campaign finance scheme in the District's history of local elections.   During the same time period, he attempted to corrupt a primary election for President of the United States. The defendant's offense strikes at a key institution for democracy: transparent and fair elections for officials.   It is difficult to overstate the severity and significance of his offense.

In addition, the Court's sentence must provide adequate general deterrence.   Campaign finance crimes, because they are committed in secret and hidden from the victims, are difficult to identify and prosecute.   Nonetheless, they have tremendous social cost – eroding faith in elections and elected officials, if not resulting in other forms of political corruption.   Deterring them therefore requires appropriate punishment when offenders are caught.   Sentences of incarceration send a message to others who may contemplate conduct similar to the defendant's – a message that violations of campaign finance laws will not be tolerated, and conduct designed to thwart the purposes behind those laws, namely transparency and the goal of a level playing field, will be dealt with seriously.   Simply put, the problem of unreported political contribution schemes is not going away.   Without the genuine cooperation of someone involved in the scheme, uncovering such conduct frequently proves exceedingly difficult, with many offenses going undetected and their perpetrators unpunished.   Indeed, the defendant's serial use of conduit contributors and shadow campaigns went undetected for many, many years.

Given the extraordinary cooperation in this matter, however, and the public exposure of defendant's serial offenses by virtue of his guilty plea, a sentence of incarceration is not required in this case to adequately reflect – on balance – the severity of the offense combined with atonement

for it in the form of substantially assisting the government's investigation and prosecution of a wide range of fraud and public corruption offenses.

### D. The Need to Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records Found Guilty of Similar Conduct.

The Government's recommended sentence falls within the D.C. Voluntary Guidelines range and takes into account the sentences of related defendants.   In connection with this investigation, one defendant, Thomas Gore (D.D.C. Case No. 1:12-cr-129 (CKK)), was sentenced to six months of incarceration.   Another defendant, Vernon Hawkins (D.D.C. Case No. 13-cr-227 (CKK), was also sentenced to six months of incarceration.   (Gore's obstruction – destroying records and lying to the FBI – was similar to Hawkins's actions, except that Hawkins compounded his obstruction by continuing his false statements and denials after his cooperation plea.) Although the extent of Thompson's crooked involvement in campaign finance contributions greatly exceeded the crimes committed by Gore and Hawkins, the quantitative and qualitative value of Thompson's cooperation greatly exceeded the cooperation provided by Gore and the non-cooperation provided by Hawkins.   The government has considered both such defendants in fashioning its recommendation in this case; it is appropriate for the Court to do so as well.

**E. The Pertinent Policy Statements Issued by the United States Sentencing Commission.**

The advisory United States Sentencing Guidelines ("Guidelines" or "USSG") recognize a downward departure for substantial assistance in the investigation and prosecution of others.   *See* U.S.S.G. § 5K1.1.   Although the Guidelines are not applicable here in the context of a D.C. Code offense, and the Government therefore is not requesting a downward departure under § 5K1.1, the Government's recommended sentence takes into account the substantial assistance provided by the defendant in the investigation and prosecution of others.

His guilty plea and cooperation pulled back the curtain on years of widespread corruption in the District of Columbia's election process.   Although led by the defendant and a crooked cadre of trusted managers, including Jeanne Clark Harris and Vernon Hawkins, the defendant's cooperation helped to establish that the corrupt election schemes involved people at all levels participating in its operation.   There were the candidates who met with the defendant behind closed doors to solicit or accept conduit contributions, shadow campaign expenditures, and promises of jobs and payments to get out of an election in exchange for endorsing the defendant's favored candidate.   There were the vendors and campaign consultants who provided supplies and services, in exchange for hundreds of thousands of dollars, to outfit and run the various shadow campaigns.   There were the conduit contributors, from all walks of life, who wrote checks to candidates while accepting reimbursements from Thompson, his companies, or his surrogates. There were the shadow campaign workers, who each primary election season were paid to conduct "voter registration drives" or "Get Out the Vote" operations, which were off-the-books campaigns intended to elect the defendant's favored candidate.   And this went on for years, without anyone

saying a word, until a failed mayoral candidate named Sulaimon Brown alleged in public that a campaign had reneged on its corrupt bargain with him.

The defendant's cooperation brought certainty – where before there had been dispute and denial – that the widespread corruption had been going on for years, affecting many of the District's contested elections, including the 2006 and 2010 primary elections for its highest elected office.   His cooperation also brought certainty to the fact that he had corrupted numerous federal elections, including the primary election for our country's highest elected office in 2008.

The defendant's substantial assistance included assistance in the investigation and prosecution of numerous matters.   As part of his plea agreement, the defendant debriefed with investigators and prosecutors fifteen times, seven times before he pleaded guilty and eight times after he pleaded guilty.   As part of his cooperation, he consented to unqualified searches of numerous personal electronic devices.   Although not all areas of his substantial assistance resulted in charges, he provided substantial assistance in the following charged matters:[8]

- ■ *United States v. Mark Long*, 2014-CF2-15615 (D.C. Superior Court):   As a result of the defendant's cooperation, Long pleaded guilty in D.C. Superior Court to conspiring to violate the D.C. campaign finance laws in connection with the 2010 mayoral primary election.   Long was sentenced to probation on July 15, 2016.

- ■ *United States v. Kelvin Robinson*, Case No. 2014-CF2-8873 (D.C. Superior Court): As a result of the defendant's cooperation, Robinson pleaded guilty to accepting illegal campaign contributions from Thompson during his unsuccessful 2010 campaign. Robinson was sentenced to probation and 100 hours of community service.

---

[8] The Government has filed concurrently an Addendum outlining areas of the defendant's substantial assistance that did not result in public charges.   Because of the compelling privacy, reputational, and due process interests implicated by those areas of uncharged conduct, the Government has filed a motion to seal the Addendum.   Further, some of the information in the Addendum is relevant to the Court's consideration of the defendant's history and characteristics under 18 U.S.C. § 3553(a)(1).

■ *United States v. Jeff Smith*, Case No. 2014-CF2-10925 (D.C. Superior Court):   Smith pleaded guilty to accepting illegal campaign contributions from Thompson during his unsuccessful 2010 campaign.   Smith was sentenced to 60 days of incarceration.

■ *United States v. Michael A. Brown*, 13-cr-164 (BAH):   As a result of the defendant's cooperation, former D.C. Councilmember Brown admitted accepting illegal campaign contributions from Thompson during Brown's successful 2008 election for At-Large Member of the D.C. Council, his unsuccessful campaign for the 2007 special election for Ward 4 Member of the D.C. Council, and his unsuccessful campaign during the 2006 mayoral election.   Such conduct was included in the Government's sentencing recommendation for Brown as part of his unrelated bribery conviction.   Brown was sentenced to 39 months of incarceration.

■ *United States v. Vernon Hawkins*, 13-cr-227 (CKK):   Although Hawkins pleaded guilty before Thompson began to cooperate, Thompson's cooperation included evidence that Hawkins's illegal involvement in the 2010 mayoral primary election went beyond the information provided by Hawkins to law enforcement agents. Specifically, Thompson provided evidence deemed credible by the Government, as part of his Plea Agreement and in debriefings with law enforcement agents, that at the request of Hawkins to cover a campaign expense promised by a close family member of Mayoral Candidate A, Thompson paid $10,000 to Person G to cover the campaign expense promised by the close family member of Mayoral Candidate A on behalf of Mayoral Campaign A.   *See* Thompson SOO ¶ 38.   Although Hawkins claimed not to remember the payment, the Government did not credit Hawkins's claimed lack of memory.   Thompson's cooperation helped to establish, in the Government's view, that Hawkins was not genuinely cooperating in the investigation and prosecution of others, as required by his plea agreement.   Such conduct was included in the Government's sentencing recommendation for Hawkins.   At Hawkins's sentencing hearing, this Court expressly credited Thompson's statements concerning an illegal campaign finance payment managed by Hawkins.

■ *United States v. Reuben O. Charles, II*, 15-cr-125 (TSC):   As a result of the defendant's cooperation, Charles, a fundraiser for Mayoral Campaign A, pleaded guilty to a misdemeanor charge of failing to file a tax return.   Charles was sentenced to 60 days of incarceration on consecutive weekends and three years of probation.

■ *United States v. Warren Graves*, 16-cr-114 (RDM):   As a result of the defendant's cooperation, Graves, a former D.C. public official, was charged by Information with a felony charge of willfully subscribing to a false return.

The defendant also provided substantial assistance in the investigation of Mayoral Candidate A.   Ultimately, however, the United States Attorney's Office decided after the

defendant pleaded guilty that it would not sponsor him as a witness in a potential prosecution of Mayoral Candidate A because of arguably impeaching evidence related to other alleged conduct by Mr. Thompson.   That is, in the investigation after his guilty plea, which included Mr. Thompson's cooperation in the then on-going investigation, the government uncovered additional evidence about Mr. Thompson's conduct that potentially could have been used to undermine his credibility as a trial witness.   As a result, the Office determined that it would not sponsor Mr. Thompson as a trial witness given its inability to discredit some of the most serious allegations related to his other conduct.[9]

Nevertheless, by putting a spotlight on the widespread history of campaign finance corruption in the District, and holding the wrongdoers accountable, the defendant's guilty plea and cooperation provide an opportunity for the District to usher in a new era of honesty, integrity, and transparency in D.C. politics.   Indeed, his admissions exposed in stark detail the years of criminal campaign finance violations and corruption in the District's election process, including the criminal participation by some of the District's candidates for elected office.

While no criminal disposition can entirely remove the temptation for those who seek to undermine the election process with excessive and unreported contributions, the defendant's epic fall financially and socially will remind those tempted to do so of the serious risks and severe consequences that await those executives who try and get caught.   Similarly, while certain candidates will continue to be tempted to undermine the election process, the guilty pleas, public shame, and punishments of those candidates corrupted by the defendant will remind those tempted

---

[9] Because the Office was unable to corroborate the most serious allegations related to the defendant's other conduct, the Office has declined to pursue criminal charges related to such conduct.

to do so in the future of the serious risks and severe consequences that await those candidates who try and get caught.   In this case, the proposed sentence is appropriately limited because of the extraordinary cooperation and admissions by the defendant, which revealed the culture of corruption which he perpetuated and permitted others who participated in it to be held accountable.

## **CONCLUSION**

For the reasons described above, the government respectfully urges that the Court sentence the defendant as recommended above.

Respectfully submitted,

CHANNING D. PHILLIPS
United States Attorney
D.C. Bar No. 415-793

_____/s/_____
Michael K. Atkinson
Assistant United States Attorney
Jonathan P. Hooks
Special Assistant United States Attorney
555 4th Street, NW
Washington, DC 20530
(202) 252-7914 (Atkinson)
Michael.Atkinson2@usdoj.gov

DATED:   July 15, 2016